Thomas J. SIMS, Plaintiff-Appellee,
Cross-Appellant,

v.

JEFFERSON DOWNS RACING ASSOCI-
ATION, INC., et al., Defendants-Appel-
lants, Cross-Appellees,

Stewards B.B. Rayburn and Claude Mau-
berret, Jr., Defendants-Appellants,
Cross-Appellees.

No. 83–3606.

United States Court of Appeals,
Fifth Circuit.

Dec. 18, 1985.

Shushan, Meyer, Jackson, McPherson & Herzog, Donald A. Meyer, New Orleans, La., for Jefferson, Krantz & Leblanc.

William J. Guste, Jr., Atty. Gen., Patricia N. Bowers, Asst. Atty. Gen., La. Dept. of Justice, New Orleans, La., for Rayburn, et al.

Keaty & Keaty, Thomas S. Keaty, Elliot Snellings, New Orleans, La., for plaintiff-appellee, cross-appellant.

Before WISDOM, GARWOOD, and DA-
VIS, Circuit Judges.

WISDOM, Circuit Judge:

This case comes before us for the second time.[1] The plaintiff/appellee, Thomas J. Sims, a horse trainer, brought this suit under 42 U.S.C. § 1983, seeking injunctive relief and damages for his expulsion from the premises of the Jefferson Downs Race Track in Kenner, Louisiana. The issues in the case, which were tried to the court, were bifurcated. The district court first found that there was sufficient state action to support jurisdiction over the § 1983 claim, but denied the claim for injunctive relief. In later proceedings, the district court found the defendants liable for damages and for attorneys fees. The defendants appeal from the finding of state action, the award of damages, and the allocation of responsibility for those damages among the defendants. The plaintiff cross-appeals from the denial of injunctive relief and from the award of damages, alleging that the district court should have awarded punitive damages and that the damages awarded for the violations of the plaintiff's constitutional rights were too low. The plaintiff also appeals from the award of attorneys fees, alleging that the district court abused its discretion in reducing the hours claimed and in awarding too low an hourly rate. We affirm in part the finding of state action, but remand for further proceedings on Sims's First Amendment claim, and on the amount of compensatory damages, punitive damages and attorneys fees that should be awarded. We hold that the plaintiff is entitled to an injunction prohibiting Jefferson Downs and its private employees from unilaterally excluding him from the premises without the proper action of the appropriate state officials.

---

**1.** *Sims v. Jefferson Downs, Inc.,* 5 Cir.1980, 611 F.2d 609.

**2.** Louisiana Rule of Racing 14(k) provides:
Any horsemen or licensed personnel or their agents causing, creating or lending to the incitement of a strike, or through compulsion dis-

### I.

Review of this case on appeal requires full recital of the facts. Dates are important.

The plaintiff, Thomas Sims, a horse trainer and holder of an owner-trainer's license, cofounded a union of horse trainers, the Louisiana Thoroughbred Trainers Association (LTTA), to improve conditions at the Jefferson Downs Race Track. Sims made complaints about the conditions at Jefferson Downs, which were publicized in a newspaper article. On August 23, 1975, the day after the article appeared, the general manager of Jefferson Downs, Marie Krantz, wrote a letter (rejection letter) to Sims barring him from all premises owned and operated by Jefferson Downs.

Charles LeBlanc, one of the track "stewards", delivered the rejection letter to Sims. Three stewards serve at each track in Louisiana. One is appointed by the Louisiana State Racing Commission (Commission), a state agency overseeing the Louisiana horse racing industry, and two are appointed by the track, subject to the approval of the Commission. The stewards supervise the daily conduct of racing at the track and generally supervise all track personnel directly connected with racing. The stewards may override track management in matters pertaining to racing. *See* La.Rev. Stat.Ann. § 4:147 (West Supp.1985); *id.* § 4:172 (West 1973); Louisiana State Racing Commission, Rules of Racing 11–6:4, 11–6:5 (1978).

LeBlanc summoned Sims over the loudspeaker of the track. When Sims arrived in the steward's office, Krantz's letter was delivered to Sims in LeBlanc's presence. A few days later, Krantz wrote to the Commission and requested that it consider whether Sims had violated Louisiana Rule of Racing 14(k), which proscribes incitement of a strike and similar activity.[2] The

---

courag[ing] any horseman from entering horses in regularly scheduled races in order to create a malfunction in scheduling a race program, or to harass or embarrass the Commission, track management or any agency connected with racing shall be called before the Commission to

following day, August 28, 1975, the Commission met in Shreveport to consider Sims's alleged violation of Rule 14(k). During this meeting, the chairman of the Commission informed its members that he had met informally with counsel for Sims and Jefferson Downs, and that the parties had reached a "gentlemen's agreement". Under the terms of this informal agreement, Sims would relinquish his owner-trainer's license for the period August 28, 1975 through November 8, 1975, but would be permitted to continue his activities as an officer of the LTTA. The parties also agreed that Sims would be restricted from entering certain portions of the track known as the "backside"—areas of the track requiring a license to enter. The agreement was read into the Commission minutes and had the force of a Commission order.

On September 2, 1975, Sims went to the Horsemen's Benevolent and Protective Association (HBPA) trailer, located on the grounds of Jefferson Downs, where LTTA maintained an office. Track security guards ordered Sims to leave the area or face arrest, and Sims obeyed. The same day, Krantz wrote to Sims and directed him to enter only those areas that were open to the general public. On September 4, after receiving Krantz's letter, Sims returned to the HBPA trailer and again was evicted from the premises by security guards acting on Krantz's orders.

On September 6, Sims wrote the stewards requesting a hearing concerning his evictions of August 23rd and August 27th. On September 13, the stewards informed Sims that they had no control over the matter because his "license status" had not been affected. On September 15, Sims wrote the Commission and requested a hearing at their next available meeting. The Commission acknowledged his letter but did not take any action on his request for a hearing.

After the period of the "gentlemen's agreement" ended on November 8, 1975, Sims applied for and received a jockey's

agent license from the Commission, and was hired as an agent by two jockeys. On March 22, 1976, he went to the track kitchen at Jefferson Downs, an area open to the general public, to conduct business for his clients. While there Sims was arrested by the Kenner Police Department on a complaint sworn by Krantz who alleged that Sims was in violation of the August 23, 1975, rejection letter.

On April 2, 1976, Sims filed suit in state court, seeking a temporary restraining order and injunction against Jefferson Downs to prevent Jefferson Downs from evicting him from the track. The court granted the temporary restraining order, but denied the injunction on April 19. Sims did not appeal this decision. On April 20, Krantz wrote to Sims to reiterate that her August 23 rejection letter was still in force and that he was barred from Jefferson Downs. On May 18, Krantz wrote the stewards requesting that because Sims had been in the track kitchen on April 29, the stewards should "take appropriate action" against Sims. In response, the stewards issued Ruling 66 denying Sims all privileges of the grounds of Jefferson Downs. The stewards issued Ruling 66 without a hearing.

Both Sims and Krantz then wrote to the Commission. Sims asked the Commission to hold a full hearing on his expulsion, on the ground that he had been denied a hearing before the issuance of the ruling by the stewards. Krantz asked the Commission to take action against Sims for his alleged violation of Rule of Racing 14(k). The stewards, in an attempt to rectify an error in issuing Ruling 66 based on an erroneous interpretation of the effect of the state court's denial of the injunction sought by Sims, issued Ruling 74, again without a hearing, which had the same effect of barring Sims from Jefferson Downs.

On May 31, 1976, Sims sent another letter to the Commission, requesting a full hearing on the two rulings by the stewards. In response, the Commission held a hearing on July 15, 1976. The Commission

show cause why their license should not be revoked.

found that Sims held a valid license and that the stewards had failed to provide Sims a hearing before issuing their rulings. The Commission ordered the stewards to provide a hearing. On July 19, 1976, rather than holding a hearing, the stewards rescinded Rulings 66 and 74.

Sims then filed suit in federal district court against Jefferson Downs, Krantz, and the Commission under 42 U.S.C. §§ 1981, 1983, 1985(3), and the First and Fourteenth Amendments. He alleged deprivation of constitutional rights in his eviction without a hearing from the track because of his exercise of First Amendment freedoms, and sought damages and injunctive relief. Jefferson Downs, Krantz, and the Commission filed motions for summary judgment or to dismiss or strike claims. Sims amended his complaint to add as defendants the members of the Commission and the stewards in their individual capacities. The district court granted the motion for summary judgment as to defendants Krantz and Jefferson Downs, and dismissed the § 1981 and the § 1985 claims against the Commission.

On appeal, this Court affirmed the dismissal of the § 1981 and § 1985(3) claims, but reversed the dismissal of the § 1983 claim against Krantz and Jefferson Downs. We remanded for a factual finding whether there had been sufficient state action in the expulsion to support a claim under § 1983. We noted that "there are substantial factual indicia that Jefferson Downs had availed itself of the Commission's regulatory powers in aid of its expulsion of Sims from its track, particularly through the track stewards...." *Sims v. Jefferson Downs, Inc.,* 5 Cir.1980, 611 F.2d 609, 612–13.

On remand, the district court bifurcated the issues for trial and first considered the issue whether the defendants' actions constituted state action sufficient to support the § 1983 claim. The court concluded that state participation in Sims's eviction during the period from August 28, 1975 (the beginning of the "gentlemen's agreement") to July 19, 1976 (when the stewards rescinded Rulings 66 and 74) amounted to state action sufficient to support jurisdiction to hear claims under § 1983 for deprivation of constitutional rights during that period. In later proceedings on the merits, the district court held that Sims's expulsion on March 22 from the track kitchen, in spite of his valid license at the time, deprived him of his liberty interest in being a jockey's agent, and the subsequent Rulings 66 and 74 without a hearing deprived him of his due process rights. In his complaint, Sims alleged that Jefferson Downs had ejected him from its track in derogation of the right of free speech guaranteed him by the First Amendment. The Court made no finding on Sims's First Amendment claim.

The court awarded Sims $49,958.26 in damages, prorated equally among Jefferson Downs, Krantz in her official capacity, and the three stewards in their individual capacities. The district court set a hearing to determine whether attorneys fees and costs should be awarded to the plaintiff. Although the plaintiffs requested an evidentiary hearing, the court held a hearing on July 20, 1983 at which only oral argument was permitted. The court awarded $27,770.33 in attorneys fees and costs to Sims's counsel who had represented him on appeal and remand, but denied attorneys fees to the attorney who had represented Sims in the initial trial. Sims filed a motion to amend the judgment with respect to attorneys fees and costs, again requesting an evidentiary hearing. After entering final judgment on September 19, 1983, the court denied Sims's motion. This appeal and cross-appeal followed.

II.

A. *Injunctive Relief*

The plaintiff sought a permanent injunction prohibiting the defendants from denying the plaintiff access to the Jefferson Downs premises. The district court refused the injunction, because it found, with respect to Jefferson Downs, that "evictions of this kind have been upheld by the courts as private actions not involving state participation". The plaintiff urges on appeal that he was entitled to an injunction be-

cause the evictions were the practical equivalent of a revocation of his license, and under Louisiana law only the Commission may revoke a license, after a hearing, and only for "just cause" as enumerated in La.Rev.Stat.Ann. § 4:152(A) (West Supp. 1985).

■ The plaintiff's second amended complaint seeks injunctive relief against all defendants. We cannot, of course, issue an injunction against the Commission itself or the stewards, who are state officers, based solely on state law. Federal courts lack jurisdiction, under the Eleventh Amendment, to enjoin state institutions and state officials on the basis of state law, *Pennhurst State School & Hosp. v. Halderman*, 1984, 465 U.S. 89, 104 S.Ct. 900, 921, 79 L.Ed.2d 67, 94. We conclude, however, that the plaintiff was entitled to an injunction against Jefferson Downs, because under state law Jefferson Downs cannot unilaterally exclude from its premises a person holding a valid Commission license.

■ Title 4, Chapter 4, Part I of the Louisiana Revised Statutes governs horse racing. Section 4:172(A) provides: "In the matters pertaining to racing, the orders of the stewards supersede the orders of the officers and directors of the association and the stewards shall have supervision of the daily conduct of racing. The stewards have full authority to investigate, inspect, search and inquire into all matters under their supervision." La.Rev.Stat.Ann. § 4:172(A) (West 1973). Under § 4:172(C), the stewards "have general supervision over all personnel directly connected with racing and shall have access to all stands, weighing rooms, enclosures, etc., used for the purpose of racing and have the authority to determine all questions concerning entries and racing". Section 4:172(D) provides that "[t]he stewards shall order ejected from the grounds of the association any improper or objectionable persons." The effect of these three sections, before amendments to Chapter 4 in 1981 and 1982, was to place the power to eject or to suspend grounds privileges solely in the hands of the stewards. *Coates v. Fairgrounds Corp.*, La.Ct.App.1982, 423 So.2d 1273, 1275.

Later amendments to Chapter 4 clarify the scope of this power. In 1981 the legislature added §§ 4:193(A) and 4:193(B). Section 4:193(A) provides that the Commission "shall adopt and promulgate rules and regulations establishing categories of persons who may be excluded or ejected from a track" and enumerates five categories that must be included in such rules and regulations. La.Rev.Stat.Ann. § 4:193(A) (West Supp.1985).[3] Section 4:193(B) pro-

---

**3.** In conjunction with defining the categories of people who may be excluded, the legislature also passed certain notice requirements, exhaustion of remedy requirements, and requirements that racetrack employees privately enforce Commission exclusion orders:

§ 191. Exclusion, ejection; initial remedy; procedure

A. If a person is excluded from or ejected from any race track, race meeting, race, or any establishment licensed to operate or conduct an exotic wagering or pari-mutuel wagering or pools by a majority of the stewards of a race track, association or establishment, the person shall exhaust all administrative remedies before the commission prior to instituting any legal action seeking judicial relief.

B. The owner or officer of a race track, association, or licensed establishment shall notify the commission in writing of any person's exclusion or ejection within three calendar days after the day on which the exclusion or ejection occurred....

§ 192. Hearing; determination; order

A. The person excluded or ejected may demand a public administrative hearing by giving to the commission written notice of his exclusion or ejection within ten calendar days after its occurrence, exclusive of Saturdays, Sundays, or legal holidays....

. . . . .

C. If the determination of the commission is that the action to exclude or eject was lawful, the commission shall order the person excluded or ejected for a specified time from all race tracks, race meetings, races, or licensed establishments that are under the commission's regulatory powers.... All orders shall be subject to review by a court of competent jurisdiction.

§ 195. Requirements to exclude, eject certain persons; penalties for failure to act

Any owner, official, supervisor, or employee of a race track, association, or a licensed establishment shall keep from the premises where he conducts his business or performs his employment any person whom he knows

vides that no person may be ejected on account of race, color, creed, national origin, ancestry, or gender. Under its authority granted by § 4:193, the Commission has promulgated rules governing exclusion and ejection, and the relevant portions are set forth in the margin.[4]

In 1982, the legislature added § 4:193(C), which provides, "No permittee in good standing shall be denied access to or racing privileges at any racing facility except in accordance with the rules of the Louisiana State Racing Commission". Section 4:143 defines a "permittee" as "any person, partnership, corporation or business entity receiving a license, permit or privilege from the Commission to engage in a business, occupation or profession on the grounds of an association licensed to conduct a race meeting in Louisiana by the Commission". In the light of § 4:193(C), a private racetrack "does not have a proprietary right, for its own reasons, to unilaterally exclude a permittee of the Louisiana State Racing Commission from its racetrack".[5] *Fox v. Louisiana State Racing Comm'n*, La.Ct. App., 433 So.2d 1123, 1126, *writ denied*, 1983, 441 So.2d 217. Such a unilateral right is inconsistent with the structure established by the legislature for revocation of a license or the privileges thereunder, which requires notice and a hearing. *Id.* at

---

is ordered by the commission to be excluded or ejected....

**4.** The rules governing exclusion and ejection are found in Louisiana State Racing Commission, Rules of Racing LAC 11–6:57 (1978 ed. & Supp. 1983), which provides in part:

57.1 No person who is known or reputed to be a bookmaker or a vagrant within the meaning of the statutes of the state of Louisiana or a fugitive from justice, or whose conduct at a race track in Louisiana or elsewhere, is or has been improper, obnoxious, unbecoming or detrimental to the best interest of racing, shall enter or remain upon the premises of any licensed association conducting a race meeting under the jurisdiction of the Commission; and all such persons shall upon discovery or recognition be for[th]with ejected.

57.2 If a majority of the stewards shall find that any person has violated any of the rules of racing, or has been involved in any action detrimental to the best interests of racing generally, they may exclude such person from the grounds, or any portion of such grounds, of the association conducting the meeting for a period not exceeding the duration of the race meet plus ten days; or they may suspend the license of such person from participating in racing in this state, for a period not exceeding the duration of the meet plus ten days, or both such exclusion and suspension; and if the stewards consider necessary any further action, they shall promptly refer the matter to the Commission.

. . . . .

57.4 It shall be the duty of the owner or officer of each association to notify the Secretary of the Commission of all ejections and exclusions, in writing, within three calendar days after the day on which the exclusion or ejection occurred, exclusive of Saturdays, Sundays or legal holidays....

57.5 The person excluded or ejected may demand a public administrative hearing before the Racing Commission, by giving the Commission written notice of the exclusion or ejection within ten calendar days after its occurrence, exclusive of Saturdays, Sundays, or legal holidays.

57.6 Upon receipt of the notice of the aggrieved person, the Commission shall call and hold a hearing at the next regular meeting of the Commission which is held not sooner than 15 days after receipt of such notice.

. . . . .

57.8 The Commission, upon evidence received at the hearing and the merits of the testimony, shall determine whether the person was lawfully excluded or ejected in accordance with its Rules and Regulations, and it is the responsibility of the owner or officer of the associated to show that the person was excluded or ejected in accordance with the Rules and Regulations.

. . . . .

57.11 Any owner, official, supervisor, or employee of an association shall keep from the premises where they conduct their business or perform their employment any person whom he knows is ordered by the Commission to be excluded or rejected....

. . . . .

**5.** The proprietary rights of the racetrack are limited by this rule only with respect to *permittees*. The 1981 amendment preserved the proprietary rights of the racetrack with respect to others, because § 2 of Acts of 1981, No. 779, which amended Title 4, Chapter 4, provided: "Nothing contained in the provisions of this Act should in anyway affect or be construed to limit or modify the proprietary rights of any owner of any establishment licensed to operate or conduct any exotic wagering or pari-mutuel wagering or pools." *See Fox v. Louisiana State Racing Comm'n*, La.Ct.App., 433 So.2d 1123, 1127, *writ denied*, 1983, 441 So.2d 217.

1128. Exclusion of permittees, therefore, may be accomplished by private parties only through the stewards, acting under the Rules of Racing, or in accordance with a valid Commission order.

We therefore conclude that the plaintiff, a permittee, was entitled to an injunction prohibiting Jefferson Downs and its private employees from unilaterally excluding him from the premises without the proper action of the stewards and the Commission in accordance with the relevant statutes and Rules of Racing.

### B. State Action

The two basic requirements for conduct to be actionable under § 1983 are: (a) a deprivation of a right secured by the Constitution or federal law, (b) occurring under color of state law. *Flagg Brothers, Inc. v. Brooks*, 1978, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185. Defendants Jefferson Downs, Krantz, and LeBlanc appeal from the finding of state action during the period from August 28, 1975 to July 19, 1976. They argue that Jefferson Downs was at all times exercising only its private proprietary rights as owner and operator of the track grounds, that the dispute was primarily a private dispute between Jefferson Downs and Sims, and that the state, through the stewards and the Commission, got "dragged in" to the dispute only incidentally. We do not agree.

The plaintiff has sued both private parties and state agents. The Commission is, quite clearly, an arm of the state, and any actions taken directly by the Commission itself constitute state action for purposes of § 1983. Although the stewards are paid by the race track, they are "state officials". *Roberts v. Louisiana Downs, Inc.*, 5 Cir.1984, 742 F.2d 221, 226; *Sims v. Jefferson Downs, Inc.*, 5 Cir.1980, 611 F.2d 609, 612. Thus, actions taken by the stewards in exercising the powers given them by statute also constitute state action for purposes of § 1983 liability.

For the conduct of a nominally private individual or entity to meet the state action requirement, there must be a sufficiently close connection between the state and the challenged conduct for the actor to be treated as an agent of the state, or the conduct to be attributed to the state. *Blum v. Yaretzky*, 1982, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534, 546; *Roberts v. Louisiana Downs, Inc.*, 5 Cir.1984, 742 F.2d 221, 224. For example, private parties can be liable under § 1983 if they have conspired with a state official. To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents". *Phillips v. Vandygriff*, 5 Cir. 1983, 711 F.2d 1217, 1225–26, *cert. denied*, 1984, — U.S. —, 105 S.Ct. 94, 83 L.Ed.2d 40 (quoting *United States v. Price*, 1966, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267, 272).

We now turn to an analysis under these principles of the facts of this case. We shall divide our analysis of the state action issue into three time periods.

*1. The Period From August 23 to August 27.* Jefferson Downs, through Marie Krantz, prepared a letter to Sims stating that he would no longer be allowed onto any portion of the racetrack property. On August 23, 1975, one of the track stewards, Charles LeBlanc, summoned Sims over the loudspeaker of the track. When Sims arrived in the steward's office, Krantz's letter was delivered to Sims in LeBlanc's presence. On August 27, Krantz wrote to the Commission and requested that it consider whether Sims had violated Louisiana Rule of Racing 14(k), which proscribes incitement of a strike and similar activity.

There was conflicting testimony concerning the role that LeBlanc played in the delivery of the letter to Sims. One of the plaintiff's witnesses testified that LeBlanc served the letter on Sims. The defendants' witnesses testified that one of the track's security guards served the letter in the presence of LeBlanc. The district court found that LeBlanc "acted in his individual, not governmental capacity, at the time the letter was delivered to Sims". The trial judge concluded, "Since the stewards were

not involved in any way in either the preparation of the letter or in the decision-making process concerning the eviction and, further, did not sanction or participate in its enforcement, I find no state participation at this point which would support a section 1983 allegation."

The plaintiff challenges this conclusion and points to *Fitzgerald v. Mountain Laurel Racing, Inc.,* 3 Cir.1979, 607 F.2d 589, *cert. denied,* 1980, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 814. That case involved a racetrack that was extensively regulated by the state of Pennsylvania under a legal structure that is similar to that of Louisiana. The track privately employed racing judges and a racing secretary, who were licensed by the state. William Fitzgerald, a licensed harness racing trainer and driver, challenged under § 1983 the track's denial of stall space to him. The track exercised its option under a stall agreement providing that the track could "refuse admittance or ... eject from the [track] anyone considered undesirable by it". *Id.* at 593 n. 5. Before the option was exercised, the plaintiff had been suspended by the racing judges for "inconsistent driving". The gist of this offense is that the driver is not giving the best performance possible, detracting from the quality of the race. As in this case, the decision to exercise the option was conveyed to the plaintiff "in the presence of the racing judges by ... the racing secretary". *Id.* at 593.

The plaintiff's reliance on *Fitzgerald* is misplaced. Although the Court held that there was state action in the track's denial of stall space, there was much greater involvement of state officials in the decision to deny stall space in *Fitzgerald* than in this case. First, "prior to exercising its rights under the stall agreement, Mountain Laurel's management met with the presiding racing judge and racing secretary who confirmed the allegations of inconsistent driving against Fitzgerald". *Id.* at 595. Second, "the defendants although claiming to have acted under a contractual right to evict from the rented stall, cited a Commission Rule violation when they acted". *Id.* at 599. Finally, the Court Found that

"[o]fficials of the Racing Commission personally and actively participated in the specific conduct challenged by Fitzgerald. Their opinion as 'racing official and judges' of Fitzgerald's conduct precipitated the ensuing summary expulsion." *Id.* This extensive participation in the decision to expel has not been shown on the part of the stewards in this case.

We hold that the factual findings upon which the district court reached its conclusion are not clearly erroneous, and we agree that LeBlanc's limited participation in the delivery of the letter on August 23 was not sufficient to charge Jefferson Downs with state action. Krantz's request on August 27 that the Commission consider sanctions under Rule of Racing 14(k) does not change this conclusion. That request was a request that the Commission make its own assessment of Sims's actions, rather than an attempt to use state machinery to enforce the private rejection letter.

*2. The Period of the Gentlemen's Agreement.* One of the members of the Commission negotiated the gentlemen's agreement governing Sims's rights to be present at the track during the period from August 28, 1975 through November 8, 1975. The agreement had the force of a Commission order. We therefore conclude that any actions taken by the race track under that agreement constitute state action. The district court found, however, that the September 4, 1975 expulsion and later arrest of Sims at the instance of the track were justified and proper, because Sims was in violation of the gentlemen's agreement. We agree.

The court also found that, with respect to Sims's request of September 15, 1975 for a Commission hearing concerning his evictions of August 23 and August 27, the Commission hearing on August 28 resolved these matters, making it unnecessary to hold another hearing on the same issues. The court therefore concluded that the Commission members acting individually did not deprive Sims of any constitution-

al rights by failing to hold a second hearing. We agree.

*3. The Period From the End of the Gentlemen's Agreement Until the Rescission of the Stewards' Rulings.* On February 11, 1976, Sims received a jockey's agent license from the Commission. The district court found that this license gave Sims the privilege of entering Jefferson Downs. The court therefore concluded that Sims's arrest by the Kenner police and removal from the track kitchen on March 22, 1976 was wrongful. The court rejected the argument of Jefferson Downs that the removal was valid because the August 23, 1975 rejection letter came back into force when the gentlemen's agreement ended. The court found that the gentlemen's agreement superseded the rejection letter.

 We need not decide whether the gentlemen's agreement superseded the rejection letter, because in any event neither the Commission nor the stewards partici-

pated in the March 22 eviction. When racing officials are not involved in a private decision to exclude a licensed trainer from a track, that exclusion does not amount to state action, *see Bier v. Fleming*, 6 Cir. 1983, 717 F.2d 308, 311 *cert. denied*, 1984, 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686, at least when there is no track employee in a position created by statute who is required to make the challenged decision, *see Roberts v. Louisiana Downs, Inc.*, 5 Cir.1984, 742 F.2d 221, 227–28.[6] Sims's eviction on March 22, therefore, even if wrongful, provides no basis for the imposition of § 1983 liability either on the Commission members or the stewards, or on Jefferson Downs or Krantz as willful participants with the stewards or the Commission.

 Nor does the involvement of the Kenner police transform the action of Jefferson Downs on March 22 into state action. The execution by a private party of a

**6.** In *Roberts*, the plaintiff, a licensed trainer of thoroughbred horses, challenged the decision of Louisiana Downs to deny stall privileges to him, which caused him to lose his employment as a trainer and racer of the horses of Paradise Farms in Texas. The Louisiana Racing Commission denied the plaintiff's request to review the decision, stating that it did not review denials of stall space, but rather only denials of racing privileges. The plaintiff filed suit against Louisiana Downs for damages and injunctive relief under § 1983, alleging that he had been denied stall space in response to his exercise of First Amendment rights. The district court granted summary judgment in favor of the defendants on the ground that there was no state action. The racetrack had argued that allocation of stalls was solely an exercise of its proprietary rights, having no connection to the state. We reversed. *Roberts v. Louisiana Downs, Inc.*, 5 Cir.1984, 742 F.2d 221. The Louisiana State Racing Commission's Rules of Racing require that a racing official designated as the "racing secretary" be present at each licensed track. Under La.Rev.Stat. Ann. § 4:172 (West 1973), the track stewards, who are state officials, "have general supervision over all personnel directly connected with racing...." Rule of Racing 11–6.6(D) provides that the racing secretary shall have the responsibility of "[a]ssigning stall applicants such stabling as he may deem proper *after consultation with the stewards,* and maintaining a record of arrival and departure of all horses stabled on association grounds" (emphasis added). We found that, under this scheme in which the racing

secretary is answerable to the stewards in matters of stalling, the racing secretary's actions "in areas in which the state's interest is evidenced by specific assignment of duties may be considered to be pursuant to authority emanating from [the stewards]". 742 F.2d at 228. We thus concluded that "[i]n the area of stalling, ... state regulation and involvement is so specific and so pervasive that decisions may be considered to bear the imprimatur of the state". *Id.* Accordingly, we reversed the grant of summary judgment, because it could not be said that "no material issue of fact exists as to the presence of state action". *Id.* at 223.

The facts of the present case do not fall within the narrow scope of the *Roberts* decision, because the duty to render decisions concerning eviction of persons from the premises of the racetrack has not been specifically delegated to a private employee of the track with the supervision of the stewards. Quite the contrary, as we shall discuss in section II.E, the right to make decisions concerning the eviction of persons holding a valid license has been reserved to the stewards themselves. Private eviction decisions, therefore, rather than being attributable to the state, are inconsistent with the statutory scheme created by the legislature for the governance of racetracks. The actions of the management of Jefferson Downs on March 22 in this case, which did not involve the stewards, were therefore in violation of state law and cannot be classified as "state action".

sworn complaint, which forms the basis for an arrest, is, without more, not sufficient to make that party's acts state action.[7] The plaintiff must show that the police in effecting the arrest acted in accordance with a "preconceived plan" to arrest a person merely because he was designated for arrest by the private party, without independent investigation. *Hernandez v. Schwegmann Bros. Giant Supermarkets*, 5 Cir.1982, 673 F.2d 771, 772; *White v. Scrivner Corp.*, 5 Cir.1979, 594 F.2d 140, 143; *Duriso v. K-Mart*, 5 Cir.1977, 559 F.2d 1274, 1277–78; *Smith v. Brookshire Brothers, Inc.*, 5 Cir.1975, 519 F.2d 93, 94 (per curiam), *cert. denied*, 1976, 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320; *Lusby v. T.G. & Y. Stores, Inc.*, 10 Cir.1984, 749 F.2d 1423, 1430; *El Fundi v. Deroche*, 8 Cir.1980, 625 F.2d 195, 196. The action by the police constitutes an "abdication of state authority" to a private party that is sufficient to cause the private party's acts to become state action. *Hernandez*, 673 F.2d at 772. The plaintiff in this case has not alleged a preconceived plan between Jefferson Downs and the Kenner police, nor has he shown that the arresting officer did not make an independent determination whether there was cause to arrest.

On April 20, Krantz wrote Sims to reiterate that her August 23 rejection letter was still in force and that he was barred from Jefferson Downs. On May 18, Krantz wrote the stewards, requesting that, because Sims had been in the track kitchen on April 29, the stewards should "take appropriate action" against Sims. In response, the stewards issued Ruling 66, and later Ruling 74, denying Sims all privileges at Jefferson Downs.

■ As we have concluded in the previous section of this opinion, Sims, by virtue of his status as a permittee in good standing, had a right under state law to have access to Jefferson Downs. Exclusion of permittees may be accomplished only through the stewards or the Commission in accordance with the rules of the Commission. The August 23 rejection letter, which was a private unilateral eviction, was therefore invalid under state law. Jefferson Downs, through Krantz, solicited the use of state power to enforce the unlawful rejection letter, and the stewards based their rulings on the rejection letter, not on an independent determination that Sims should be evicted under the rules of the Commission. Because Krantz both solicited and was granted this improper use of state power, we conclude that Krantz was a "willful participant in joint activity with the State or its agents."[8] *Phillips v. Vandygriff*, 5 Cir.1983, 711 F.2d 1217, 1225–26, *cert. denied*, 1984, —— U.S. ——, 105 S.Ct. 94, 83 L.Ed.2d 40. We cannot agree that the stewards' participation was "de minimis". Without the stewards participation in Sims's eviction, there would have been no eviction and therefore no claim under § 1983.

■ The district court concluded that, because these rulings were issued without a hearing, the stewards acting in their individual capacities violated Sims's due process rights. Although the stewards do not challenge this ruling on appeal, Jefferson Downs and Krantz argue that this violation should not be imputed to them. We agree that the violation of Sims's due process rights resulting from the stewards' failure to hold a hearing should not be imputed to Jefferson Downs. Jefferson Downs did not request that the rulings be issued without a hearing, nor did it have any part in the stewards' decision not to hold a hearing.

■ The track may nevertheless have violated federal law. Sims alleges that officials of Jefferson Downs enlisted state

---

**7.** *Cf. Tarkowski v. Robert Bartlett Realty Co.*, 7 Cir. 1980, 644 F.2d 1204, 1206 ("[A] private person is not engaged in state action when he merely lodges a complaint with the police, the prosecutor, or when he invokes the exercise of judicial authority....").

**8.** The rulings stated that Sims was being evicted from the track for the reasons that he had "been ejected by Jefferson Downs management and [was] not allowed on the property of Jefferson Downs Race Track." *Sims v. Jefferson Downs, Inc.*, 5 Cir.1980, 611 F.2d 609, 613 n. 7.

authorities to exclude Sims from the grounds because Sims made public statements criticizing conditions at the track, and because Sims was attempting to organize an association of horse trainers at Jefferson Downs. In fact, Krantz issued her original rejection letter just one day after Sims's criticisms were published in a newspaper interview. When this case first came before our Court, we remanded for findings on Sims's allegation "that Jefferson Downs had ejected him from its track, in derogation of rights of free speech and of assembly guaranteed him by the First and Fourteenth Amendments." [9] 611 F.2d at 612.

We now remand a second time so that the district court may consider the merits of Sims's First Amendment claim. The district court must determine whether Sims's rights were denied as a direct result of his speech. *See Mount Healthy City School District v. Doyle,* 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471; *United Carolina Bank v. Board of Regents,* 5 Cir.1982, 665 F.2d 553, 561–62.[10] In this factual setting, the question for decision is whether Rulings 66 and 74 were issued as a direct result of Sims's protected First Amendment activity.

On remand, the district court should also consider any state law claims over which it may properly exercise pendent jurisdiction.

Our reading of the amended complaint discloses no state law claim, however.

### C. *Liability of Krantz*

Although we vacate the judgments against Jefferson Downs and Krantz, we proceed to discuss two issues that may arise a second time if Sims prevails on his First Amendment claim against those defendants. We do so to provide additional guidance to the district court in this difficult case.

 First, the district court ruled "that all of Krantz's actions were in her official capacity as Vice President and General Manager of Jefferson Downs, and not in any individual capacity. To that extent the complaint against her is dismissed." [11] The court then entered judgment against Krantz "in her official capacity". The defendants filed a motion for a new trial based, in part, on the court's entry of judgment against Krantz in her official capacity. Krantz argues on appeal that a judgment cannot lie against one who acts in an official corporate capacity when there is also a judgment against the corporation. Because the court dismissed the claims against Krantz in her individual capacity, and because there was no allegation that any actions taken by Krantz in her official capacity were *ultra vires,* Krantz con-

---

**9.** In our first opinion, we said:

> [T]here are substantial factual indicia that Jefferson Downs had availed itself of the commission's regulatory powers in aid of its expulsion of Sims from its track, particularly through the track stewards, state regulatory agents, all three of whom however are paid by Jefferson Downs.
>
> The record thus demonstrates a disputed issue of material fact concerning the involvement of state agents acting under color of state law and their close connexity with the expulsion by Jefferson Downs of Sims from its race track because of his exercise of alleged constitutional rights.
>
> 611 F.2d at 612–13.

**10.** Sims's Second Amended Complaint alleges only one specific violation of the plaintiff's First Amendment rights: Sims's arrest by the Kenner police. Because we have found that the involvement of the Kenner police does not transform

the action of Jefferson Downs on March 22 into state action, Sims cannot prevail on the basis of this specific allegation. Sims also alleges, however, that "[b]ecause of the plaintiff's involvement with the organization and planning of the Louisiana Thoroughbred Trainers Association, and because of plaintiff's exercise of his constitutional rights of freedom of speech and freedom of association ... the defendants herein, Jefferson Downs Racing Association, Marie Krantz, and the Louisiana State Racing Commission and its Stewards in co-operation, conjunction, and participation with one another, did willfully and intentionally deny the plaintiff the right of access to Jefferson Downs Racing Association facilities." R. at I, 193. The district court must proceed to consider the merits of this allegation.

**11.** The plaintiff has not appealed the dismissal of claims against Krantz in her individual capacity.

cludes that the entry of judgment against her was erroneous.

We agree. Under Louisiana law, a plaintiff who is injured by the acts of a corporate officer can sue both the officer individually and the corporation. *See Miller v. Keating*, La.1977, 349 So.2d 265, *H.B. "Buster" Hughes, Inc. v. Bernard*, La. 1975, 318 So.2d 9, 12; *Ladas v. Savage*, La.Ct.App.1973, 284 So.2d 852; *Pack v. Wise*, La.Ct.App., 155 So.2d 909, *aff'd mem.*, 1963, 157 So.2d 231. As a general rule, a corporation is liable, like a natural person, for the torts of its officers or agents committed in the course and scope of their employment. *See Miller v. Keating*, La.1977, 349 So.2d 265; *Matthews v. Otis Mfg. Co.*, 1917, 142 La. 88, 76 So. 249. In the present case, the district court dismissed the action against Krantz in her individual capacity. Therefore, any liability that attaches for Krantz's actions in her official capacity, which were clearly within the course and scope of her employment, runs against the corporation. *See* W. Knepper, Liability of Corporate Officers and Directors § 5.08, at 121 (3d ed. 1978). The district court's entry of judgment against *both* the corporation and Krantz in her official capacity would therefore effectively make the corporation liable twice for the same act.[12]

Our conclusion that, outside of an action against an officer personally, a plaintiff does not have an action against both the corporation and its officer in an official capacity is confirmed by *Ladas v. Savage*, La.Ct.App.1973, 284 So.2d 852, in which the court stated:

> [P]laintiff ... sued Savage [a corporate officer] personally for negligence in mishandling plaintiff's money. If Savage acted as a corporate officer in taking plaintiff's money without any intention

of delivering the stock to him, then the plaintiff could additionally sue *the corporation.*

*Id.* at 855 (emphasis added). We conclude that the district court's entry of judgment against Krantz in her official capacity was erroneous.

### D. *Apportionment of Damages*

If the plaintiff prevails against all the defendants on the First Amendment claim, the district court will again face the issue of apportioning the damages.[13] The district court apportioned the award of damages and attorneys fees equally among each of the stewards, Jefferson Downs, and Krantz in her official capacity. Although no party has challenged on appeal the fact of apportionment itself, stewards Benjamin Rayburn, Jr. and Claude Mauberret, Jr. argue that the award should not have been prorated equally among the defendants. In particular, they argue that Jefferson Downs and Krantz should bear primary responsibility for the damages because the dispute was principally between Jefferson Downs and Sims and the stewards' participation was "de minimis".

Because it is clear that, as a practical matter, the district court's judgment against Krantz in her official capacity was equivalent to a judgment against the corporation itself, which would have to pay it, we interpret the district court's apportionment as a finding that the corporation should bear 40 percent responsibility for the damages and the stewards 60 percent. We find no basis for this apportionment. The defendants are solidarily liable.[14]

Article 2324 of the Louisiana Civil Code provides, in part: "He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable in solido [jointly and severally]

---

**12.** Krantz is the only person alleged to have acted tortiously on behalf of Jefferson Downs.

**13.** The stewards are solely liable for the Due Process violation. The apportionment issue will arise only if more than one defendant is found liable for the First Amendment violation.

**14.** *See, e.g., Davis v. West Community Hosp.*, 5 Cir.1985, 755 F.2d 455, 467–68 (apportionment); *Creamer v. Porter*, 5 Cir.1985, 754 F.2d 1311, 1316–17 (joint and several liability); *Dean v. Gladney*, 5 Cir.1980, 621 F.2d 1331, 1338–39, *cert. denied sub nom. Dean v. County of Brazoria*, 1981, 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819.

with that person for the damage caused by such act." Jefferson Downs, through Krantz, assisted and encouraged the stewards in ejecting Sims. The stewards too participated in that action and are solidarily liable for all damages flowing from Sims's single injury.

Article 2324 is somewhat similar to the Texas doctrine of "indivisible injury":

> Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may separately or against all in one suit.

*Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952).

### E. *The Amount of Damages*

*1. Compensatory Damages.* On February 11, 1976, Sims received a jockey's agent license from the Commission and thereafter secured an oral contract with Ralph Shubert, a jockey, under which Sims would receive 20 percent of the purse won by Shubert after March 27, 1976. The district court found that "as a result of the March 22 ejection and arrest by Jefferson and Krantz, Sims was terminated as a jockey's agent". Accordingly, the district court computed the plaintiff's damages by taking 20 percent of Shubert's average earnings in 1976 and awarding this amount for each year from the arrest to the time of trial.

■ We reverse this award of damages, because it was based on the district court's finding that the arrest of March 22 caused the loss of the contract with Shubert, and we have concluded that the March 22 arrest did not constitute state action. The only wrongful *state action* occurred when the stewards, at the urging of the race-

track, decided to issue rulings against Sims on an improper ground and then did so without a hearing. We therefore remand for a hearing to determine the extent, if any, that the plaintiff's damages were caused or enhanced by the racetrack's invocation of the stewards' power to issue rulings and the issuance of those rulings on an improper ground and without a hearing. It may be that, but for the state's placing its "imprimatur" on the March 22 eviction, the plaintiff would not have been damaged to the extent that he was. The district court should decide this issue after hearing evidence from the parties.

■ The plaintiff also argues that the district court should have awarded damages for the plaintiff's loss of the right to pursue his chosen profession, a liberty interest. The plaintiff contended at oral argument that there should have been an award for loss of this liberty interest in and of itself, apart from the award of compensatory damages. We reject this argument. The plaintiff presented no evidence how such an interest is to be valued "in the abstract", apart from compensatory damages for lost earnings.[15] Moreover, the plaintiff presented in the district court no evidence of lost future earnings that the plaintiff would have gained in pursuit of his profession, other than the damages flowing from the loss of the contract with Shubert.

■ *2. Damages for Humiliation and Punitive Damages.* The court awarded Sims $5000 "for humiliation and harassment". The defendants argue that this award was unwarranted because Sims's testimony was not corroborated by other witnesses or evidence. Sims argues that the award was inadequate considering the extreme effect the expulsion had on his life and livelihood. Although we disagree with the defendants that Sims's testimony was uncorroborated, because his wife testified

---

**15.** In the light of our holding that the March 22 arrest—which the district court found to be the cause of the loss of the contract with Shubert—did not constitute state action, it is clear that such state action as there was in this case was not the sole cause of the plaintiff's alleged loss of the liberty interest to pursue his profession. This fact renders it even more difficult to decide what an appropriate award would be in this case for the loss of this interest in the abstract.

to the effect the expulsion had on Sims's life and their marriage, we reverse the award and remand for reconsideration of this award, along with reconsideration of the compensatory damage award. The district court should determine what portion of Sims's "humiliation and harassment" was caused by the wrongful state action after the March 22 arrest.

■ In his second amended complaint, the plaintiff sought punitive damages, alleging that the defendants "did maliciously and intentionally cause to be spread, and did spread, vicious rumors regarding the plaintiff's character and/or ability to train horses". The plaintiff also alleged that the defendants evidenced a "malicious disregard of his civil rights". The Supreme Court has ruled that punitive damages may be assessed under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others". *Smith v. Wade*, 1983, 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632, 651. Although the plaintiff alleged facts that, if proved, might form the basis for an award of punitive damages, the district court in its opinion made no mention of punitive damages. On remand the district court should rule on the question whether the plaintiff is entitled to these damages.

F. *Attorneys Fees*

The plaintiff sought attorneys fees under 42 U.S.C. § 1988 (1982), which allows the court in its discretion to award reasonable attorneys fees to the "prevailing party" in a proceeding under § 1983. The plaintiff sought fees for attorney Thomas Keaty, who handled all action in state court and before the Commission, the preparatory work for filing the complaint in federal district court, and certain discovery matters. The plaintiff also sought fees for attorney Elliot Snellings, who prosecuted the first appeal to this Court and all later proceedings. Sims paid Keaty $500 in fees and performed carpentry work on Keaty's home valued at $1115. Snellings has been working on a contingency basis, and therefore has been paid nothing so far.

The district court accepted affidavits submitted in support of the fee request, but declined to hold an evidentiary hearing before ruling on the motion for fees. The court based its decision primarily on language in *Hensley v. Eckerhart*, 1983, 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40, 52, stating that, in deciding whether an adjustment upward or downward of the fee is appropriate, "the most critical factor is the degree of success obtained". The district court applied this "success factor" to deny fees to attorney Keaty, because he found that Keaty's efforts were unsuccessful at both the state and federal level, and that it was not until Snellings began work on the case that favorable results were finally obtained. The court concluded that "the $500 payment and the carpentry services adequately compensated Mr. Keaty for his services in light of the unsuccessful results".

With respect to Snellings, the court found that some of the hours claimed were duplicative and excessive, citing four entries in the attorney's affidavit without further explanation. The court concluded that 360 hours was a reasonable amount of time to have spent on the litigation. With respect to an hourly rate, the court found that $75 an hour was a reasonable rate for professional legal services in the New Orleans area, based on an affidavit of a New Orleans attorney. The court recited the 12 *Johnson* factors,[16] but did not specifically

---

**16.** The *Johnson* factors are as follows: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee for similar work in the community, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson v. Geor-*

apply them, other than to conclude that, "considering the results obtained (a $49,-958.26 judgment)", an adjustment of the basic fee of 360 hours times $75 was unwarranted.

In this circuit, the determination of a reasonable attorneys fee under § 1988 involves consideration of the 12 *Johnson* factors. Those factors should be considered in the following framework, based on our discussions of methodology in *Copper Liquor, Inc. v. Adolph Coors Co.*, 5 Cir. 1982, 684 F.2d 1087, 1092–97, and *Riddell v. National Democratic Party*, 5 Cir. 1983, 712 F.2d 165, 169–70:

1. *Ascertain the nature and extent of the services supplied by the attorney.* This involves an examination of time records submitted by the attorney to determine which hours should be compensated. Hours may be disallowed for duplication, vagueness, excessiveness, or for other good reasons.

2. *Value the services according to the customary fee and quality of the legal work.* This involves selection of an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases.

The product of the number of compensable hours times the selected hourly rate forms the "lodestar". The Supreme Court has concluded that "the 'product of reasonable hours times a reasonable rate' normally provides a 'reasonable' attorney's fee within the meaning of [§ 1988]". *Blum v. Stenson*, 1984, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (quoting *Hensley v. Eckerhart*, 1983, 461 U.S. 424, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40, 50–51). "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained'." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. These "other considerations" constitute the third step.

3. *Adjust the lodestar on the basis of the Johnson factors that may be of significance in the particular case.* We recently noted that "our circuit's method ... is generally to apply th[e] *Johnson* factors *after* the lodestar has been calculated". *Riddell v. National Democratic Party*, 5 Cir.1983, 712 F.2d 165, 170. The Supreme Court observed, however, that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate". *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9, 76 L.Ed.2d at 51 n. 9. We have recognized this fact, and have held that "a court need not in determining the [adjustment] consider some factor already included in the calculation of the lodestar". *Graves v. Barnes*, 5 Cir.1983, 700 F.2d 220, 224. The important point is that the district court "explain the findings and reasons upon which the award is based, including an indication of how each of the twelve factors in *Johnson* affected his decision". *Copper Liquor, Inc. v. Adolph Coors Co.*, 5 Cir.1980, 624 F.2d 575, 581 (quoting *Matter of First Colonial Corp. of America*, 5 Cir., 544 F.2d 1291, 1300, *cert. denied sub nom. Baddock v. American Benefit Life Ins. Co.*, 1977, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388).

 Based on these principles, we reverse the district court's ruling with respect to attorney Snellings for two reasons. First, in view of our reversal of the damage award and the refusal to grant an injunction, the district court should have an opportunity to reconsider the fee issue in the light of the final judgment after further proceedings. Second, we are unable to review the court's actions for abuse of discretion based on the record before us. The court did not set forth its reasons for disallowing 108 hours claimed by Snellings, other than to cite four diary entries and to state that it found duplication and excessiveness. We cannot tell from the diary entries themselves why they are duplicative, nor what other hours were disallowed in the reduction of 108. We are also un-

able to review whether the selection of a $75 rate was an abuse of discretion, because the court relies only on one affidavit of a New Orleans attorney. The figures in that affidavit demonstrate that $75 is at the low end of the range of customary rates for attorneys of Snellings's experience, but the district court did not state why a lower rate was appropriate. We intimate no view concerning what an appropriate rate or number of hours should be in this case; we simply must be provided reasons for the figures selected to be able to review the award. Finally, the district court recited the 12 *Johnson* factors but did not specifically apply them.

We also reverse the ruling with respect to attorney Keaty. If we accept the correctness of the district court's finding that the $1615 of value the Keaty received from Sims in cash and services adequately compensated Keaty for his work on the case, then at a minimum the court should have assessed that amount against the defendants, because the plaintiff himself had to pay this amount. "The purpose of section 1988 is to encourage enforcement of the Civil Rights Acts by compensating those persons who bring meritorious actions." *Pickett v. Milam*, 8 Cir.1978, 579 F.2d 1118, 1121. More importantly, the district court's opinion gives no analysis of how it arrived at the conclusion that the $1615 figure was adequate. Keaty submitted affidavits alleging 320 hours of work on the case. The district court did not state which of these hours were being allowed for compensation, nor did it select an appropriate rate. We are therefore unable to review the court's conclusion for abuse of discretion, and must remand for a statement of the method by which the court arrived at its conclusion.

### III.

We conclude that the stewards are liable for issuing Rulings 66 and 74 without a hearing. Neither Krantz nor Jefferson Downs is liable for the violation of Sims's due process rights, because neither had any part in the stewards' decision not to hold a hearing. On remand, the district court must determine whether any or all of the defendants are liable for violating Sim's First Amendment rights.

We further conclude that the March 22 arrest of Sims at the instance of Krantz and Jefferson Downs did not constitute state action, but that the later invocation of the stewards' power to issue rulings, which were in aid of the private rejection letter of Krantz, did constitute state action. Because the district court found that the plaintiff's damages were caused by the March 22 arrest, we reverse the award and remand for further proceedings on the extent to which the plaintiff's damages, both for lost wages and for humiliation and harassment, were caused or enhanced by the violation of the plaintiff's rights when the stewards issued Rulings 66 and 74 on an improper ground and failed to hold a hearing before issuing these rulings. The district court should also rule on the plaintiff's claim for punitive damages. With respect to all other time periods at issue, we affirm the district court's rulings concerning state action, as well as its rulings that the plaintiffs were not damaged by such state action as existed during those periods.

We vacate the judgment against Krantz in her official capacity. Under Louisiana law, liability for actions taken in her official capacity runs against Jefferson Downs. We further hold that the plaintiff was entitled, under state law, to an injunction prohibiting Jefferson Downs and its private employees from unilaterally excluding him from the premises without the proper action of the stewards and the Commission in accordance with the relevant statutes and Rules of Racing.

We remand for further proceedings on the First Amendment claim, and on the damages and attorneys fees, in accordance with the standards we have summarized.

The judgment of the district court is REVERSED IN PART AND AFFIRMED IN PART and the case is REMANDED for further proceedings consistent with this opinion.