**SCHOOL BOARD OF the PARISH OF LIVINGSTON, LA., etc., et al., Plaintiffs-Appellants,**

v.

**LOUISIANA STATE BOARD OF ELEMENTARY & SECONDARY EDUCATION, etc., et al., Defendants-Appellees.**

No. 86–3470.

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1987.

Rehearing and Rehearing En Banc Denied Dec. 28, 1987.

R. Bruce Macmurdo, Stefes & Macmurdo, Baton Rouge, La., for State Bd. of Elementary and Secondary Education.

Winston G. DeCuir and Martha Hess, Baton Rouge, La., for Treasurer of State of La.

Robert E. Harroun, III, Baton Rouge, La., for Auditor.

Before GARWOOD, JOLLY, and HILL *, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs-appellants Livingston and Grant Parish School Boards, their individual members, and schoolchildren and their parents who reside in those parishes (collectively, the plaintiffs) brought this 42 U.S.C. § 1983 suit attacking the Louisiana system of financing public education. Named as defendants were the members of the Louisiana State Board of Elementary and Secondary Education (BESE), the treasurer of the State of Louisiana, and the state's legislative auditor. Upon submission of cross-motions for summary judgment, the district court dismissed the plaintiffs' suit with prejudice. The plaintiffs appeal that judgment, claiming that the state's system of financing public education violates the equal protection clause of the Fourteenth Amendment. Finding no constitutional violation, we affirm the district court's dismissal.

### Facts and Proceedings Below

Louisiana's elementary and secondary public school system is financed by a combination of federal, state, and local funding. During the 1983–84 school year, the last year for which complete figures were available when the record below was completed, federal revenues constituted 9.8 percent of all funds spent, state revenues represented 53.4 percent, and local revenues contributed 36.8 percent. The major (but not the sole) source of the state's

Fred G. Benton, Jr., Katherine Wheeler, Benton, Benton & Benton, Baton Rouge, La., for plaintiffs-appellants.

* Judge Hill concurred in the above opinion before his death on October 19, 1987.

contribution is the Minimum Foundation Program (MFP), the stated purpose of which is to provide funds sufficient to ensure an adequate minimum foundation program of education in all public schools in the state.[1]

Pursuant to the state constitution, the BESE administers the MFP. To implement the program, the BESE adopts a formula each year by which the MFP funds are to be allocated to each of Louisiana's sixty-six parish and city school systems.[2] The legislature must then approve the formula before appropriating funds for the MFP. For the last several years, the BESE has proposed, and the Louisiana legislature has adopted, essentially the same formula. *See* Appendix A for the 1983–84 version of this formula. As in previous years, the 1983–84 MFP formula contains a "cost-side" and a "supply-side." The cost-side establishes the minimum cost of providing each of the services funded under the MFP. The supply-side of the formula calculates the respective contributions of the state and the local school districts, on a district-by-district basis.

Pursuant to the cost-side of the MFP formula, the cost of funding the MFP is calculated essentially on the basis of student membership (per capita basis). The formula allocates to local school boards funds to provide at least one teacher for every twenty-five students, as well as funding for other support personnel including principals, assistant principals, instructional supervisors, visiting teachers, and social workers. *See* Appendix A; *see also* La. Rev.Stat.Ann § 17:7 (West 1982 & Supp. 1987). Sabbatical and sick leave pay, injured and unemployed workers' compensation costs, utilities, insurance, and materials and supplies are also provided for, with the funds distributed on the basis of student membership. The MFP also funds a "special education program," which provides salaries for teachers and other personnel.[3] The state, supplying funds from its general revenues, finances approximately ninety-four percent of the MFP, and the school districts in the aggregate are responsible for the remaining six percent.

The six percent aggregate local contribution is apportioned among districts in a manner designed to ameliorate, in part, the differences in each district's relative tax-paying ability. To achieve its partial equalizing effect, the MFP formula assumes that each local school board has passed and collected a uniform ad valorem property tax of five and a half mills of the currently assessed value of all taxable property in that district.[4] The sum that such a tax would yield is then deducted from the cost of providing the MFP services for a given district, and the remainder represents the state's MFP contribution to that district.

Local school districts finance their share of MFP costs, along with supplemental funding for the schools within the district, with revenues from locally imposed property and sales and use taxes, from sixteenth-

---

1. The MFP is currently mandated by article 8, section 13(B), of the Louisiana Constitution, which provides:

    "**(B) Minimum Foundation Program.** The legislature shall appropriate funds sufficient to insure a minimum foundation program of education in all public elementary and secondary schools. The funds appropriated shall be equitably allocated to parish and city school systems according to formulas adopted by the State Board of Elementary and Secondary Education and approved by the legislature prior to making the appropriation."

2. There are sixty-six school districts in Louisiana. Of these, sixty-four are co-extensive with the state's sixty-four parishes. The other two represent separately the public schools for the cities of Monroe and Bogalusa. Each school district is governed by a corresponding parish or city school board. For ease of discussion, "parish," "school district," and "school board" will be used interchangeably in this opinion.

3. In addition to the MFP, the state separately provides free school books for all schoolchildren, *see* La. Const. art. 8, § 13(A); La.Rev.Stat. Ann. § 17:351 (West 1982), free school lunches to needy children, *see id.* §§ 17:191–:199 (West 1982), and a teachers' retirement fund, *see id.* §§ 17:571–:764 (West 1982 & Supp.1987). No complaint is made respecting these items.

4. The equalizing factor in the MFP formula excludes property that is exempt from taxation due to Louisiana's constitutionally mandated homestead exemption. *See* La. Const. art. 7, § 20; *see also* note 10 and Appendix A, *infra*.

section lands,[5] and from local bond issuances. Article 8, section 13(C), of the Louisiana Constitution authorizes each local school board [6] to levy annually an ad valorem tax not to exceed five mills per dollar of taxable property within the district. The state constitution also permits any school district to levy a special ad valorem property tax for the support of schools when authorized by vote of a majority of electors in the district. *See* La. Const. art. 8, § 13(C); *id.* art. 6, § 32. Neither the constitution nor the legislature has limited the rate or amount of special property taxes that the local electorate may authorize a school district to levy.[7] With voter approval, local school boards may also levy a sales and use tax of up to four percent of revenues derived from personal property and services sold within the district.[8]

In addition, local school boards may finance their contribution to public education within their district with any funds the school board receives from the state's "revenue sharing fund." In its current form, the mandate to create the revenue-sharing fund is set forth in article 7, section 26 of the Louisiana Constitution.[9] This provision

---

5. Sixteenth-section lands are lands that were donated by the United States Congress to Louisiana and other states, or localities within them, for support of public education. Before Louisiana was granted statehood, the lands located in what was contemplated to and did soon become the State of Louisiana were reserved by Congress for the support of schools within the township in which each sixteenth-section was located. *See* Act of Apr. 21, 1806, ch. 39, § 11, 2 Stat. 391, 394; Act of Mar. 3, 1811, ch. 46, § 4, 2 Stat. 662, 663; *see also* J. Madden, *Federal and State Lands in Louisiana* Ch. 16 (1975). Upon its admission to the Union as a state in 1812, title to the sixteenth-section lands in Louisiana passed from the United States to the state "for the support of schools in the [respective] townships." *State of Louisiana v. William T. Joyce Co.*, 261 F. 128, 131 (5th Cir.1919), *cert. denied*, 253 U.S. 484, 40 S.Ct. 481, 64 L.Ed. 1024 (1920); J. Madden, *supra*, at 234–35. Subsequently, in Louisiana most of these lands were sold by the state to parish school boards of the parishes in which the land was located to be used for educational purposes. *Cacioppo v. Tangipahoa Parish School Bd.*, 404 So.2d 945, 946 (La.1981); La.Rev.Stat.Ann. § 41:631 (West 1965); *see also* J. Madden, *supra*, at 246–54. Apparently, some school districts obtain substantial revenues from leasing the mineral rights to these lands, while other districts obtain none because the sixteenth-section lands within the latter districts are either valueless or were sold long ago for nominal sums. Comment, *Inequality in Louisiana Public School Finance: Should Educational Quality Depend on a Student's School District Residency*, 60 Tul.L.Rev. 1269, 1271–72 (1986) (authored by Douglas McKeige); *see also* Proceedings of the 1974 Louisiana Constitutional Convention, 87th Day's Proceedings—Nov. 16, 1973, at 2448–50; *id.* 88th Day's Proceedings—Nov. 17, 1973, at 2456–61.

Plaintiffs state in their brief to this Court that "[r]evenues from the mineral lease of the 16th section and other school lands do not represent a high proportion of total local revenues for the state as a whole. (Since 1966–67, these revenues have comprised less than 3% of the total)."

6. The state constitution makes an exception in the case of the Orleans Parish School Board, allowing it to levy local ad valorem property taxes up to thirteen mills without obtaining voter authorization. *See* La. Const. art. 8, § 13(C).

7. *See* La. Const. art. 6, § 32, art. 8, § 13; La. Rev.Stat.Ann. § 39:703 (West 1968); *see also Howe v. DeSoto Parish School Bd.*, 373 So.2d 248, 251 (La.App.2d Cir.1979). All property exempt from state taxation under Louisiana's homestead exemption, however, is also exempt from these local ad valorem property taxes. La. Const. art. 7, § 20 (West Supp.1987); La.Rev. Stat.Ann. § 47:1703 (West Supp.1987).

8. Article 6, section 29, of the Louisiana Constitution expressly authorizes this sales and use tax for up to three percent, and permits the legislature to authorize additional amounts. The legislature has authorized the school boards to levy an additional sales tax at a rate not to exceed one percent to provide funds for payment of teacher salaries and operation of public elementary and secondary schools in the parish. La. Rev.Stat.Ann. § 33:2737 (West 1966 & Supp. 1987).

9. In relevant part, this section provides:
   "Section 26. **(A) Creation of Fund.** The Revenue Sharing Fund is created as a special fund in the state treasury.
   "**(B) Annual Allocation.** The sum of ninety million dollars is allocated annually from the state general fund to the revenue sharing fund. The legislature may appropriate additional sums to the fund.
   "**(C) Distribution Formula.** The revenue sharing fund shall be distributed annually as provided by law solely on the basis of population and number of homesteads in each parish in proportion to population and the number of homesteads throughout the state. Unless otherwise provided by law, population statistics of the last federal decennial census shall be utilized for this purpose. After deductions in each parish for retirement sys-

establishes an annual $90,000,000 fund to be created as a special fund in the state treasury, and to be distributed to parishes according to a legislatively derived formula. The stated purpose of the fund is to offset losses incurred due to Louisiana's constitutionally prescribed homestead exemption from state and local ad valorem property taxes.[10] Revenue-sharing funds must be distributed to each parish on the basis of the relative population of the parish (eighty percent of the fund) and the ratio of number of homesteads in the parish to the total number of homesteads throughout the state (twenty percent of the fund). La. Const. art. 7, § 26(C); *see also* 1984 La. Acts No. 946, § 3.[11]

According to the legislature's formula, the revenue-sharing funds are then distributed to a number of tax recipient bodies within the parishes, including school boards. *See, e.g.,* 1984 La. Acts No. 946. Any funds remaining after disbursement according to this formula are further allocated to eligible tax recipient bodies and municipalities. In parishes having a high percentage of property to which the homestead exemption applies, there are no "ex-cesses" for further distribution, and in many cases, the funds allocated to a parish do not totally reimburse each of the tax recipient bodies for the full amount of revenues lost by virtue of the homestead exemption. Thus, in some parishes, the school board receives revenue-sharing funds sufficient to replace all the property tax revenues that cannot be collected due to the homestead exemption, as well as additional monies from "excess" state revenue-sharing funds. In other parishes, however, amounts lost by virtue of the homestead exemption are not completely reimbursed and no excess funds are available for further distribution to the school board. In 1984, the last year for which data was introduced into the record, the parishes of the plaintiff school boards were among thirty-eight parishes that were incompletely reimbursed for property tax revenues uncollectable due to the homestead exemption.

On May 31, 1985, the plaintiffs filed this suit for declaratory and injunctive relief against the BESE, its individual members in their official capacities, the state treasur-

---

tems and commissions as authorized by law, the remaining funds, to the extent available, shall be distributed by first priority to the tax recipient bodies within the parish, as defined by law, to offset current losses because of homestead exemptions granted in this Article. Any balance remaining in a parish distribution shall be allocated to the municipalities and tax recipient bodies within each parish as provided by law."

The current revenue-sharing fund is the successor to the "property tax relief fund," which was established by amendment to the 1921 Louisiana Constitution. *See* La. Const. of 1921, art. X, § 4, ¶ 9(a); *see also Levy v. Parker,* 346 F.Supp. 897, 899 (E.D.La.1972), *aff'd,* 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973). Like the revenue-sharing fund, the property tax relief fund was designed to reimburse local governments for revenues lost due to the state's property tax homestead exemption. Because Louisiana then lacked a uniform system for assessment of property subject to ad valorem taxation, and because disbursement of the fund was based on that assessment, in 1972 the legislature's distribution formula for the property tax relief fund was declared unconstitutional under the equal protection clause of the Fourteenth Amendment. *See Levy,* 346 F.Supp. at 903–05. In response to *Levy,* the Louisiana Constitution was amended to replace the property tax relief fund with the revenue-sharing fund. *See* La. Const. of 1921, art. X, § 10B (added by Acts 1972, Ex. Sess., No. 18, adopted Nov. 7, 1972).

**10.** Louisiana's homestead exemption is set forth in article 7, section 20, of the state constitution. It currently exempts homestead owners from the first $7,500 of property taxes, which at the current ten percent rate of state ad valorem property taxes, *see* La. Const. art. 7, § 18, means that the first $75,000 in assessed value of a homestead is not taxed.

**11.** The actual extent to which a parish, or any of the tax recipient bodies within the parish, is unable to collect property taxes due to the homestead exemption thus does not directly affect the amount of revenue-sharing funds it receives. This independence was deliberately created by amendment to the state constitution following the *Levy* decision, *see* note 9, *supra,* which had held that the state's prior homestead exemption reimbursement scheme, which did directly relate the two, was unconstitutional. *See also Drewett v. Louisiana,* 334 So.2d 443, 445–46 (La.App. 1st Cir.), *writ denied,* 338 So.2d 288 (La.1976) ("[W]rit denied. The judgment of the court of appeal is correct."), *appeal dismissed for want of a substantial federal question,* 430 U.S. 912, 97 S.Ct. 1322, 51 L.Ed.2d 590 (1977).

er, and the state's legislative auditor. The complaint asserted a cause of action under 42 U.S.C. § 1983 and invoked federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). Initially, the plaintiffs alleged that Louisiana's system of financing its public elementary and secondary schools violated the equal protection clause of the Fourteenth Amendment, the privileges and immunities clause of article IV of the United States Constitution, and article 7, section 26, of the Louisiana Constitution. Subsequently, they amended their complaint to delete the claimed violations of the Louisiana Constitution.

The parties submitted cross-motions for summary judgment. The plaintiffs also moved for preliminary certification of a class of similarly situated persons, but the district court continued that motion pending its resolution of the summary judgment motions. Following submission of memoranda and oral argument by the various parties, the district court eventually granted summary judgments in favor of all of the defendants, dismissing the plaintiffs' suit with prejudice. The plaintiffs then brought this appeal.

**Discussion**

On appeal the plaintiffs raise only the issue whether Louisiana's system of public school financing denies them equal protection. They first argue that the supply-side of the MFP formula, which reduces the state's contribution to each parish by the amount of revenues that would be generated by a locally imposed five and a half mills tax on that parish's taxable property, has an "arbitrary, rather than [an] equalizing," effect. Furthermore, the plaintiffs contend, because disparities exist in the amount of revenues available to parishes for support of public schools, and because part of that disparity is a result of the means authorized by the state for localities to generate school support revenues, the state must distribute MFP funds on the

basis of "relative need," rather than according to its current, predominantly per capita basis. Finally, the plaintiffs also claim that the legislature's formula for distribution of the $90,000,000 revenue-sharing fund unlawfully discriminates against parishes having a large percentage of property subject to the homestead exemption by arbitrarily providing the school boards in those parishes less state funds for school support.

*I. Standard of Review*

■ Our standard for testing the plaintiffs' equal protection challenges to Louisiana's system of funding public school education hinges upon the nature of the rights affected by the classification scheme at issue here. This is not a case where the state has failed to provide schoolchildren in the plaintiff parishes with a minimally adequate education. Although the plaintiffs so complain on appeal, they made no attempt to prove before the district court that any child received an inadequate education. Furthermore, the record contains no evidence whatever that any Louisiana schoolchild was deprived of a minimally adequate education because of insufficient funds.[12] Consequently, the classifications challenged in this case are not entitled to any heightened scrutiny under the equal protection clause based upon any theory— the abstract validity of which we do not address—either of wealth being a suspect classification or of education being a fundamental right. *See Papasan v. Allain,* —— U.S. ——, 106 S.Ct. 2932, 2943–45, 92 L.Ed. 2d 209 (1986).

Instead, the funding disparities attacked by the plaintiffs are properly analyzed under the so-called rational basis standard. *See San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); *accord Papasan,* 106 S.Ct. at 2945. Under this standard the state's school financing scheme will withstand equal protection clause scrutiny if it rationally furthers a legitimate state pur-

---

12. Although the district court decided the case on summary judgment, the parties conceded that all the relevant facts were before the court.

pose or interest. *Rodriguez*, 93 S.Ct. at 1308. In a rational basis analysis, we presume the constitutionality under the federal constitution of state-authorized discriminations. We require the parties challenging the state's judgment to show either that the state had no constitutionally valid purpose for developing the classifications at issue, or that the state could not reasonably have concluded that the allegedly unlawful classifications were rationally related to such a purpose. *See, e.g., New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 2517–18, 49 L.Ed.2d 511 (1976).

## II. Application to Facts

■ Applying the rational basis test to the plaintiffs' challenges to Louisiana's school financing system, we conclude that the plaintiffs have failed to meet their burden of proving that the state's scheme violates their Fourteenth Amendment right to equal protection of the laws.[13]

### A. Equalization

■ First, despite the plaintiffs' argument to the contrary, we conclude that the BESE "equalization factor" is rationally related to its stated purpose of tending to equalize local school district contribution to the MFP according to each district's wealth. As noted, the "cost-side" of the MFP formula calculates for each district the total cost of providing every student in that district the educational services—such as one teacher per twenty-five students and appropriate numbers of other personnel, special education costs, utilities, supplies, insurance, and the like—which the program contemplates every district and student having. The state pays to each district an amount equal to this entire cost in that district *less* what that district could raise by a uniform ad valorem property tax of five and a half mills of the currently assessed value of all *taxable* property in the district.[14] Thus, districts with more taxable property pay a higher percentage of the cost of the MFP within the district, and the state pays a lesser percent. Districts with a high percentage of their total property in tax exempt homesteads are helped by this formula because only taxable property is used to calculate the amount generated by the hypothetical local tax, which amount serves to reduce the portion of the MFP cost in that district borne by the state. Accordingly, the formula tends to favor districts which are "poorer" in terms of *taxable* property values.

**13.** We express no opinion about whether the Louisiana system of public school financing comports with the state constitution. *See* Comment, *Inequality in Louisiana Public School Finance: Should Educational Quality Depend on a Student's School District Residency*, 60 Tul.L. Rev. 1269 (1986). This Comment, though it states that "[i]f rational basis review is applied, the system would most likely be found constitutional," *id.* at 1293, nevertheless argues that, particularly in view of the preamble to the education clause of the Louisiana Constitution and the provision of its article 8, section 13(B) that MFP funds "be equitably allocated" (*see* note 1, *supra*), a more searching standard of review should be applied under which the system could properly, and should, be found contrary to the state constitution. *Id.* at 1294–97. However, after observing that "[t]he [Louisiana] constitution's ambiguity allows a judicial interpretation at either extreme," the Comment suggests (with what seems to be disapproval) that "[t]he most likely result" is that the "Louisiana Supreme Court would uphold the system." *Id.* at 1297.

Although the plaintiffs initially alleged state constitutional violations, they amended their complaint to delete those claims. On appeal, however, the plaintiffs raise a number of arguments going to the claimed failure of the state legislature's distribution formulas for the MFP and the revenue-sharing fund to comport with various provisions of the Louisiana Constitution. Even if these arguments were otherwise properly before this Court, which they are not, we could not address them. Since Louisiana has not waived its Eleventh Amendment immunity, federal courts lack jurisdiction to decide pendent state law claims for prospective, injunctive relief against the state or its state officials. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 906–20, 79 L.Ed.2d 67 (1984); *Sims v. Jefferson Downs Racing Ass'n*, 778 F.2d 1068, 1074 (5th Cir.1985). Consequently, in this appeal, we will ignore any arguments made by the plaintiffs that the state's school financing system violates the Louisiana Constitution.

**14.** We observe that plaintiffs have expressly disclaimed any argument based on an assertion that the assessed values used are not a sufficiently uniform percentage of market value; at two places in their brief to this Court, plaintiffs state that "[u]nequal assessment ratios are not involved in the present case."

We observe that the MFP *cost* formula is just that, namely, an attempt to measure the cost in each district of providing the same educational services to each student. This is because special factors in some districts—such as economy of scale, concentrations of special education students, or the like [15]—may render it less expensive, on a per student basis, to provide the same services as are provided in other districts. In other words, what is uniform in this side of the MFP is the services to be provided per student, not the dollar cost per student. Thus, for example, the record reflects that in 1983–84 the total cost per student of the MFP contemplated educational services was $1,385 per student in Cameron Parish and $1,075 per student in Livingston Parish, though the services covered by the MFP were the same in each parish. This doubtless resulted, at least in substantial part, from differing economics of scale, as Livingston Parish had some 15,583 students and Cameron Parish only 2,150.[16] We do not understand plaintiffs to have attacked the MFP *total cost* formula below. That is to say, plaintiffs did not assert, and the record does not demonstrate, that there would be any material inequality if the state paid the entire MFP (instead of ninety-four percent of it) and no other funds (or nonfederal funds) were spent on public school education. Accordingly, as to the MFP, the relevant comparison between parishes is not the state MFP dollar contribution per student in each, but rather the percentage of the total MFP cost per student which the state bears in each parish respectively.

Throughout this litigation, plaintiffs have sought to compare the Livingston Parish school district with that of Cameron Parish, which is by far the most affluent district in the state. For 1983–84, the total per pupil educational expenditure from all sources was $1,892 in Livingston Parish, the lowest in the state, compared with $6,099 in Cameron Parish, the highest in the state.[17] However, of the total MFP cost per student in Cameron Parish, the state contributed 77.08 percent and Cameron Parish contributed 22.92 percent, while in Livingston Parish the state contributed 98.43 percent of the total MFP cost per student and Livingston Parish contributed only 1.57 percent. The state's bearing a much higher percentage of the total MFP cost per student in Livingston Parish than in Cameron Parish results from the Cameron Parish assessed value of taxable property per student ($59,700) being much higher than that of Livingston Parish ($3,333, the next to lowest in the state).[18]

**15.** But these special factors do not, as we understand it, include different unit costing—*i.e.*, similar level teachers' salaries are costed uniformly per teacher.

**16.** The 1983–84 total MFP cost per parish and the portion thereof borne by the state and by the parish, respectively, under the MFP are shown by Table III of Exhibit 21 (Tab 25 to appellants' record excerpts) (we have ignored that year's 2.575425 percent across-the-board reduction in state contribution due to a funding shortfall, as well as that year's increase in state contribution in respect to the school lunch personnel salaries; it is not contended that these items are significant, and they, or at least the former, appear to be extraneous to the normal workings of the MFP formula). The 1983–84 student population figures are from Exhibit 11 (this also shows the total educational expenditures—not just the state and local share of the MFP—per student, per parish).

**17.** We observe that little Cameron Parish is (as a result of its sixteenth-section income) really an anomaly in respect to its total educational ex- penditures per student. The next two highest parishes in terms of overall total per student expenditures are West Feliciana (1,394 students, $3,649 total per student) and Pointe Coupee (3,785 students, $3,229 total per student). The two parishes with the lowest total educational expenditures per student, after Livingston, are Vernon (12,182 students, $2,041 total per student) and Evangeline (7,389 students, $2,144 total per student).

**18.** Similarly, in Grant Parish, where per student total expenditures from all sources were $2,187 and taxable assessed value per student was $4,492, the state contributed 98.23 percent of the total MFP cost per student in the parish, and Grant Parish contributed only 1.77 percent thereof.

The percentages of total MFP cost per student paid by the local parish in the other parishes mentioned in note 17, *supra*, were as follows: West Feliciana (8.01 percent); Pointe Coupee (7.95 percent); Vernon (1.55 percent); Evangeline (3.46 percent).

The MFP and total expenditure figures are for 1983–84 and are computed from the sources

Based on the 1983–84 data submitted by the parties, it clearly appears that the local districts with less value per student of taxable property contribute a smaller fraction of their per student MFP cost than do the districts having higher values per student of taxable property, with the state contributing a correspondingly higher fraction of the MFP cost in the former districts. Thus, while the supply side of the BESE equalization formula produces a local contribution that may reflect relative school district wealth less than if it also accounted for interdistrict differences in sales tax, bond, and sixteenth-section land revenues, the formula is not without some substantial equalizing effect. We find that the MFP formula's equalization factor does not violate the equal protection clause. *See Rodriguez*, 93 S.Ct. at 1286.

### B. *Distribution of the MFP Funds*

 ▮ Likewise, we do not find any equal protection violation as a result of the state's allocation of funds pursuant to the MFP. Under the MFP, funds are allotted to each school district according to the cost-side of the BESE formula. *See* Appendix A. The formula distributes funds on essentially a per capita cost of equal service basis. It determines teacher and other personnel costs, as well as costs of materials and utilities, on the basis of student membership. Of the numerous expenses funded under the program, only transportation costs are determined on the basis of actual cost, rather than on a per student basis.

As noted above, the Louisiana legislature has authorized the school boards to generate revenues not only by levying local ad valorem property taxes, but also by imposing a local sales and use tax and by issuing bonds. In addition, some school boards are able to obtain funds from revenues derived from sixteenth-section lands owned by their parish and/or from their allocation of revenue-sharing funds. The plaintiffs complain that by authorizing local sales taxes and bond issuances and by then failing to account for these "state-fostered" revenue sources and for revenues from sixteenth-section lands owned by local districts [19] in calculating the cost of funding public education, the state has acted to create inequalities among school districts in the amount of revenues available for school support.

The plaintiffs do not directly challenge the propriety of the state's chosen means of allowing local school districts to finance education at the local level. Instead, they argue that the equal protection clause requires the state, through the BESE formula, to calculate educational costs in a manner that takes fully into account substantially all of the sources of interdistrict disparities in local funding ability rather than on a predominantly per capita, across-the-board basis. Alternatively, they contend, to pass constitutional muster, the formula must offset the disparities in local funding ability by taking substantially all such disparities into account in determining the amount of each parish's contribution to the MFP. Thus, according to the plaintiffs, by allocating MFP funds on essentially a per capita basis and by equalizing local contri-

and by the means indicated in note 16, *supra;* the assessed taxable value figures are for 1984–85 and are from Exhibit 4A (Tab 4 to appellants' record excerpts).

**19.** In contrast to *Papasan v. Allain*, —— U.S. ——, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), which focused entirely upon Mississippi's distribution of funds derived from sixteenth-section lands owned by the state, the plaintiffs in this case do not directly challenge the state's historical or present administration of sixteenth-section lands at all—either sixteenth-section lands now owned by parishes or lands Louisiana owns. *See* note 5, *supra*. Unlike the situation in *Papasan*, 106 S.Ct. at 2946–47 & n. 18, the plaintiffs here do not ask that each parish be treated the same because the source of the funds in question is the federal government. Nor do they assert that the sixteenth-section lands in Louisiana are state-owned lands whose revenues must be used equally throughout the state. Instead, the plaintiffs merely claim that the state's failure to reduce the amount of state funds contributed to each parish under the MFP formula by the total amount of local revenues (including revenues from sixteenth-section lands owned by a parish) available to the parish for school support is impermissibly discriminatory. Consequently, the present appeal does not raise the issue, presented in *Papasan*, of the constitutionality of the state's distribution of funds derived from state-owned sixteenth-section lands.

bution only by the assumed five and a half mills property tax, the MFP formula results in a state-fostered net inequality among parishes in available public school funding that violates the equal protection clause.

To the extent that we understand it, we find this argument unpersuasive. The district court found that Louisiana's MFP reflected two competing legitimate state goals, that of assuring each child in the state an opportunity for a basic education on an equal basis and of permitting and maintaining some measure of local autonomy over public education. We concur with the district court that Louisiana's allocation of MFP funds is responsive to these two goals. The program provides basic educational requirements on an equal basis throughout the state by allocating funds on the basis of student membership; yet, by not cancelling out all disparities in local revenues available for school support, the program also gives local school districts encouragement and flexibility to supplement state funds. It is plain that the state's public school educational financing does not enhance, but rather materially diminishes, the inequalities in educational services which would exist between parishes if the state provided no such support and spent the funds in question for other purposes.

It may be true, as the plaintiffs urge, that the failure of Louisiana's school financing system to ameliorate all differences in local district wealth serves as a disincentive in some poorer parishes to tax more heavily in order to make up for these differences. Nevertheless, the system cannot be condemned because it imperfectly and incompletely effectuates the state's goals. *Rodriguez*, 93 S.Ct. at 1306; *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Moreover, as long as the state's means of achieving its objective is not so irrational as to be invidiously discriminatory, the financing scheme does not fail merely because other methods of serving these goals exist that would result in smaller interdistrict disparities in school support expenditures. At least where, as here, no suspect class or fundamental right is involved, the equal protection clause "does not require absolute equality or precisely equal advantages." *Rodriguez*, 93 S.Ct. at 1291. We find that the program's formula is rationally related to the MFP's goals of providing each child in each school district with certain basic educational necessities and of encouraging local governments to provide additional educational support on a local level, to the extent that they choose to and are financially able to do so. We therefore reject the plaintiffs' challenge to the MFP formula's method of allocating funds and determining local contribution.

### C. *Revenue-Sharing Fund*

■ Finally, we also reject the plaintiffs' attack on Louisiana's revenue-sharing fund. The plaintiffs assert that the fund is unconstitutional because the revenue-sharing distribution formula fails to fully reimburse school boards in parishes having a disproportionately high percentage of property subject to the homestead exemption for the property tax revenues those school boards lose by operation of the homestead exemption. According to the plaintiffs, the legislature's formula for distribution of the state's revenue-sharing fund is not rationally related to its stated purpose of offsetting losses incurred by virtue of the homestead exemption.

We disagree. While the distribution formula does not always directly reimburse local school boards for every dollar of property tax the school boards cannot collect due to the homestead exemption, the "80 % per capita, 20% per household" method of distributing the revenue-sharing fund is a rational one. It is not unreasonable for the state to suppose, as this formula does, that parishes with larger concentrations of population and homesteads will generally lose more property tax revenues due to the homestead exemption than will less populous parishes. Rough accommodations are constitutionally permissible, even where not wholly logical or scientific. *See U.S. R.R. Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). Within each parish, the fund sup-

plements resources available to a host of tax recipient bodies, not just school boards. The distribution of funds within the parishes recognizes the impact of the homestead exemption upon the local tax recipient bodies by proportioning the funds according to amounts lost.[20] The revenue-sharing fund distribution formula is deliberately independent of the direct property tax revenue loss from the homestead exemption on a parish-by-parish basis because historical attempts at direct reimbursement on this basis resulted in deliberate manipulation of homestead exemption losses by some parishes. *See Levy v. Parker,* 346 F.Supp. 897 (E.D. La.1972), *aff'd,* 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955 (1973); *see also* note 9, *supra.* Furthermore, while the distribution formula disadvantages school boards in parishes with a high percentage of homestead exempt property by not fully reimbursing their loss of property tax revenues, the homestead exemption itself counteracts that loss to some extent by providing residents in those parishes with saved property tax dollars that can be used to stimulate the local economy, ease the burden of local sales taxes, and support local education in other ways. In sum, therefore, the state's homestead exemption and revenue-sharing fund reimbursement system involves a balancing of historical and economic factors that is reasonably related to the state's valid objectives of relieving poorer homeowners of the burdens of property taxation, *see Levy,* 346 F.Supp. at 899, and of partially reimbursing local governments for losses resulting from the exemption. Consequently, as with the other components of Louisiana's school financing system challenged in this lawsuit, we find no equal protection violation in the distribution of the state's revenue-sharing fund.[21]

### Conclusion

We conclude that the principles of *Rodriguez* are controlling and mandate affirmance of the district court's judgment. The interparish disparities in total educational expenditures per student appear to be less wide than the Texas interschool district disparities involved in *Rodriguez,* especially laying aside small, aberrational Cameron Parish.[22] In Louisiana, the total state

---

**20.** The distribution formula enacted by the legislature for 1984, *see* 1984 La.Acts No. 946, which is apparently substantially the same as the formulas used for several preceding years, directs that within-parish distribution of the revenue-sharing fund be made only to "eligible" tax recipient bodies. The legislature has defined eligible tax recipient bodies to include only bodies that were eligible for reimbursement from the property tax relief fund prior to its abolition, *id.* § 1(a)(1), plus some specifically designated other local tax recipient bodies. *Id.* § 1(a)(4). The plaintiffs also argue that the legislature's determination of which local bodies are eligible to receive revenue-sharing funds furthers no legitimate state goal; they contend that it serves only to cut off school boards from full reimbursement for "venal political reasons," namely, to preserve the funds for local governmental activities that are more popular than education. The state counters, persuasively, that its designation of eligible intraparish tax recipient bodies is designed to prevent "internecine warfare among the various political bodies in a parish" and that this is a valid state goal. We think the state has a legitimate interest in maintaining political harmony among local governmental bodies. By distributing the revenue-sharing funds on a per capita, per household basis to each parish, and to eligible tax recipient bodies within parishes, the legislature is able to offset homestead exemption losses while simultaneously avoiding intraparish battles about how the funds will be distributed. We therefore reject the plaintiffs' equal protection challenge to the revenue-sharing fund distribution formula on this ground.

**21.** We also observe that the revenue-sharing fund distribution scheme was upheld against an equal protection attack in *Drewett v. Louisiana,* 334 So.2d 443 (La.App. 1st Cir.), *writ denied,* 338 So.2d 288 (La.1976) ("The judgment of the court of appeals is correct."), *appeal dismissed for want of a substantial question,* 430 U.S. 912, 97 S.Ct. 1322, 51 L.Ed.2d 590 (1977). The United States Supreme Court's dismissal is a judgment on the merits, with precedential value, albeit of a limited and restricted nature. *See Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975). We rejected another equal protection challenge, of a somewhat different nature, to an intraparish distribution of the revenue-sharing fund in *Town of Bell v. Rapides Parish Police Jury,* 746 F.2d 1049 (5th Cir.1984).

**22.** We have calculated (from Exhibit 11) that for 1983–84 the average all-source total educational expenditure per student of the seven parishes having the highest figure in this respect was $3,628 per student (eliminating Cameron Parish, the average for the other six was $3,217 per student), and the similar average for the thus

contribution—which has an equalizing influence—represents 53.4 percent of all public school spending, and local revenues account for only 36.8 percent; in *Rodriguez,* the state share was 48 percent and the local share 41.1 percent. *Id.* 93 S.Ct. at 1284 & n. 21. Moreover, in Texas, the prime equalization funding mechanism—the Foundation School Program—was eighty percent state funded and 20 percent locally funded, *id.,* while the Louisiana MFP is approximately ninety-four percent state funded. Moreover, certain wealthier school districts in Texas netted significantly *more per student* from the Foundation School Program than did significantly poorer districts. *Id.* at 1286. *See also id.* at 1321 (dissenting opinion of Justice Marshall).[23] Texas school districts did not have sales tax authority, as Louisiana districts do[24]; and, unlike the situation in Louisiana, Texas limited the rate of local ad valorem taxation. While Louisiana's homestead exemption is significantly higher than Texas' was, nevertheless this is at least partially offset by the Louisiana revenue-sharing fund. Nevertheless, it remains true in Louisiana, as in Texas, that "[t]hose districts that have more property, or more valuable property, have a greater capability for supplementing state funds." *Id.* at 1303. But this is a necessary consequence of reliance on local taxation for local expenditures, and such reliance, despite that consequence, is not unconstitutional. *Id.* at 1307.

We reject the plaintiffs' equal protection challenges to the Louisiana system of funding public school education. Accordingly, we affirm the district court's dismissal of their suit.

AFFIRMED.

## APPENDIX A

For the 1983–84 school year, the following MFP formula was adopted by the BESE and approved by the Louisiana legislature.

### EQUALIZATION FORMULA
### 1983–84 SCHOOL YEAR—CURRENT BASIS

**I. COST OF MINIMUM FOUNDATION PROGRAM** (for a full nine-month session, based on membership and other current data at first reporting period 1983–84)

A. Regular Education

1. Regular Teachers—total number alloted and employed (34,819.5), on the basis of current student membership, at salary according to State Minimum Salary Schedule,

measured lowest seven parishes was $2,129. The relative disparity between these extremes is thus 1.7–to–1 with Cameron Parish included, and 1.5–to–1 without Cameron Parish.

Another standard which may be used to make comparisons between parishes is the percentage which the all-source total educational expenditure per student in a given parish is of the total MFP cost per student in that parish. The average percentage in this respect for the seven parishes with the highest all-source total educational expenditure per student is 255.98 percent (excluding Cameron Parish, the average is 225.25 percent); for the seven parishes with lowest total educational expenditure per student, the average percentage in this respect is 176.78 percent. These figures produce a ratio between the high group average and the low group average of 1.45–to–1; excluding Cameron Parish, the ratio is 1.27–to–1.

These disparities are not as wide as those indicated in *Rodriguez. Id.* 93 S.Ct. at 1286–87 & n. 38 (n. 38 reflects "State & Local Revenue Per Pupil" for the top ten districts, of the 110 districts surveyed, of $815, compared to $305 for the lowest four districts surveyed, and $462 for the forty next to the lowest districts; the resulting ratios are 2.67–to–1, top ten to lowest four, and 1.76–to–1, top ten to forty next to the lowest). *See also id.* at 1321 & n. 38 (dissenting opinion of Justice Marshall, showing, *inter alia,* that for 1970–71 the chosen illustrative districts, Edgewood and Alamo Heights, had total state and local funds per student of $418 and $913, respectively, a 2.18–to–1 ratio).

23. Of the two illustrative districts, the much wealthier, Alamo Heights, received $491 per student from the state, while the poorer district, Edgewood, received only $356 per student (1970–71).

24. As previously noted, Louisiana districts can tax local sales and services up to four percent. For the years shown by the record, none taxed above two percent.

the allotment to be the sum of a school-by-school allotment and an allotment on a parishwide basis as follows: ................................................. $510,988,414

    a.  School-by-school based on a 25-to-1 pupil-teacher ratio for all grades, with the current allotment table for secondary schools or departments applied to total membership in each school, beginning at the fourth step. (This eliminates for allotment purposes schools with a membership of fewer than 117, except those small high schools located more than ten miles from next high school. In such cases the schools will be alloted one teacher for each secondary grade.)

    b.  Parishwide basis on sliding scale, beginning with a 200-to-1 pupil-teacher ratio for the first 5,000 student membership; 350-to-1 for the next 5,001 to 10,250; 500-to-1 for the next 10,251 to 25,250; 750-to-1 for the next 25,251 to 50,000; and 1,000-to-1 pupil-teacher ratio for membership over 50,000.

    c.  In addition to the allotment of teachers in a. and b. above, a supplemental allotment of teachers shall be made for grades K–3, using the difference between a 24-to-1 pupil-teacher ratio and a 25-to-1 pupil-teacher ratio, to be applied on a parishwide basis to the total membership in grades K–3.

    d.  Parishwide basis using difference of 20-to-1 and 24-to-1 in K–3 to extent funds were appropriated ($2M) in 1983.

    e.  Base salary and salary increment for Certified Second Language Specialists in Elementary Grades, Act 714 of 1975 and Senate Concurrent Resolution No. 15 of 1st E.S. 1977.

2.  Instructional Supervisors, Visiting Teachers, Social Workers, Principals, Assistant Principals, and other certified or licensed personnel (2,247)—one (1) allotted for each 15 teachers, including special education teachers, allotted and employed for those parishes with fewer than 201 teachers allotted in 1a. and 1b., one (1) allotted for each 18 teachers, including special education teachers, allotted and employed for those parishes allotted 201 to 350 teachers allotted in 1a. and 1b., one (1) allotted for each 20 teachers, including special education teachers, allotted and employed for those parishes allotted more than 350 teachers in 1a. and 1b. (total number allotted and employed at 1⅛ times actual salary according to the State Minimum Salary Schedule for teachers). The allocation of administrative positions in Item 2 provides that a principal be allotted to each school, and that no parish be allotted fewer administrative positions for the fiscal year 1983–84 than were allotted and employed during the 1982–83 school year ................................................. 49,608,319

3.  Transportation—actual cost of approved bus routes (7,511), based on the State Minimum Salary Schedule for bus drivers ....................................... 109,645,949

4.  Sabbatical Leave Pay—one-half of the pay of the State Minimum Salary Schedule for a beginning teacher with a Bachelor's degree multiplied by the actual number (full-time equivalent) on sabbatical leave for the previous years, $5,688 × 806 ................................................................ 4,694,875

5.  Accumulated Sick Leave Severance Pay (not to exceed 25 days for any employee)—75% of the actual payments for the previous year (to be distributed on the baiss of student membership) membership 778,593.5 × $2.259146 ........................ 1,879,388

6.  Workmen's Compensation—75% of the actual payments for the previous year (to be distributed on the basis of student membership) membership 778,593.5 × $5.406043 ................................................................ 4,420,897

7.  Unemployment Compensation—75% of the actual payments for the previous school year (to be distributed on the basis of student membership) membership 778,593.5 × $1.978865 ....................................................... 1,807,598

8.  Utilities, Insurance (other than unemployment and workmen's compensation insurance), Materials and Supplies, and Repair and Upkeep of Plant—membership 778,593.5 × $60 ............................................................ 46,776,150

9. Salary Adjustments for Other School Employees—salary increases for administrative, clerical, maintenance and custodial employees, and other employees whose salaries are not governed by a State Minimum Salary Schedule. This does not include employees paid from the School Lunch Program, federal programs, etc. (to be distributed on the basis of student membership—cost per student figure established in 1982–83 to remain constant until further increases are granted) membership 778,593.5 × $87,324523 ................................................. $ 67,990,306

    Sub-total ........................................................ $797,811,896

B.  Special Education Program

1. Special Education Teachers—total number allotted and employed (7,255.9) based on pupil teacher ratios contained in Regulations Implementing Act 754 of 1977 multiplied by salary according to State Minimum Salary Schedule for teachers ... $ 99,695,549

2. Special Education Supervisors—one for each parish, if employed, 65 at 1⅓ times salary according to the State Minimum Salary Schedule for teachers ................ 1,442,984

3. Special Education Teacher Aides—number allotted and employed (3,699) based on ratios contained in Regulations for Implementing Act 754 of 1977 multiplied by actual salary, limited to $5,619 per aide .......................................... 20,784,681

4. Special Education Bus Attendants—actual salary of each approved attendant, limited to $4,233 per bus attendant ............................................... 2,620,161

5. Pupil Appraisal, Assessment Teachers, and other expenses (744.7) times 1⅓ State Minimum Salary Schedule for teachers ..................................... 17,047,604

    Sub-total ................................................................ $141,590,979

    Total Cost of Minimum Foundation Program ............................... $939,402,875

II.  **MEASURE OF LOCAL WEALTH INCLUDED IN SUPPORT OF MINIMUM FOUNDATION PROGRAM**

A.  Ad Valorem Tax—Gross Yield of 5–½ mills of current assessed value of taxable property

    Total Support for Minimum Foundation Program ........................... $ 54,333,600

III.  **DIFFERENCE NECESSARY TO EQUALIZE** ........................... $885,069,275

  1.  Adjustments, 1982–83 (net due Parishes) ..................................... 923,316

  2.  Less Reduction (.02575425) .............................................. 22,818,075

    Reduced Difference to Equalize .......................................... $863,174,516